IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NEHA SINGHAL | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 19-cv-1362 |
| | § | |
| BAYLOR COLLEGE OF MEDICINE | § | |
| | § | JURY TRIAL DEMANDED |
| *Defendant.* | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW Neha Singhal ("Singhal" or "Plaintiff"), and complains of Baylor College of Medicine ("BCM" or "Defendant"), and for his cause of action would respectfully show the Court as follows:

### I. SUMMARY

1. BCM discriminated against, retaliated against, and failed to accommodate Singhal based on her disability and requests for accommodations.  Accordingly, BCM violated Section 504 of the Rehabilitation Act.  *See* 29 U.S.C. § 794, 794(a).

### II. PARTIES

2. Plaintiff Neha Singhal is an individual residing in Texas.

3. Defendant Baylor College of Medicine is a nonprofit corporation with a principal place of business in Harris County, Texas.  BCM may be served with process by serving its registered agent, James Banfield, Baylor College of Medicine, One Baylor Plaza, Suite 106A, Houston, Texas 77030.

1

### III. NATURE OF ACTION

4. This is an action filed under Section 504 of the Rehabilitation Act to recover damages owed by BCM to Singhal. *See* 29 U.S.C. § 794.

### IV. JURISDICTION AND VENUE

5. This Court has federal question jurisdiction under 28 U.S.C. §§ 1331.

6. Venue of this action is proper in this district and division under 28 U.S.C. § 1391(b)(1) and (b)(2) because BCM has a principal place of business in the Houston Division of the Southern District of Texas and/or a substantial part of the events or omissions giving rise to Singhal's claims occurred in the Southern District of Texas.

### V. FACTUAL BACKGROUND

7. BCM is headquartered in Houston, Texas.

8. BCM is a health sciences university that includes medical and graduate schools, is affiliated with several hospitals or hospital systems, and conducts biomedical and other scientific research.

9. BCM receives funding from the National Institutes of Health.

10. BCM receives funding from the federal government.

11. BCM has a legal responsibility to maintain a workplace free of unlawful discrimination and retaliation.

12. BCM must protect its employees from unlawful discrimination and retaliation.

13. BCM has an obligation to try to reasonable accommodate its employees who have disabilities.

14. BCM understands that it is illegal to discriminate against an employee based on her disability.

15. BCM understands that it is illegal to retaliate against an employee for requesting disability-related accommodations.

16. BCM offered Singhal a job on or about September 27, 2014 for the position of Postdoctoral Associate in the department of Molecular Physiology, with a start date of November 1, 2014.

17. Singhal accepted the job and began working for BCM in November 2014.

18. Singhal suffers from serious medical conditions that substantially limits major life activities, such as her ability to walk, stand, climb stairs, and perform repeated motions.

19. For example, Singhal had been suffering from knee arthritis and related back problems, that limited her ability to walk, stand, and climb stairs.

20. Singhal was also diagnosed with Ehlers-Danlos Syndrome in February 2016. One of the symptoms associated with this is having loose joints, such that she can easily suffer dislocations. She also suffers from other symptoms associated with this disease.

21. During the time period from November 2014 through the end of her employment with BCM, symptoms associated with her medical conditions increased due to BCM's failure to accommodate; however, at all times she could perform the essential job duties of her positions.

22. Beginning in about October 2016, Singhal's medical conditions required her to use a wheelchair more frequently.

23. Throughout November 2014 to January 2015, Singhal made several requests for assistance to get accommodations with respect to her parking situation. The reason for this was to limit the amount the distance she would be walking or climbing stairs (such as via a parking shuttle).

24. After numerous requests by Singhal, BCM finally got her access to a parking garage that was closer to her place of work and would not require her to take a shuttle. However, the delays of about 2.5 months made her medical conditions worse.

25. During 2015 and 2016, Singhal informed her supervisor James Martin, that due to her disability she needed accommodation at work and that the lack of the accommodation was causing her condition to worsen. She was not provided with the accommodations.

26. In early August 2016, Singhal informed her supervisor, James Martin, that she would be having a surgery on August 17, 2016, and reminding him that she has a genetic connective tissue disorder and suffers from cranial and cervical instability, which causes headaches, dizziness, and other problems.

27. A few days later, in August 2017, Martin informed Singhal that her position with the lab, and her employment with BCM, would be ending on October 31, 2016. This was later extended to end of November 2016.

28. However, Singhal was able to secure other employment with BCM, working under Arun Sreekumar in a different lab.

29. She started working under Sreekumar in early 2017.

30. Throughout Singhal's tenure under Sreekumar, Sreekumar treated other non-disabled employees more favorably.

31. On April 21, 2017, Singhal sent an email to BCM's employee relations' department requesting automatic doors at BCM's front entrance so that she could utilize her wheelchair. Without automatic doors, she has extreme difficulty entering the building because the door closes on her or her wheelchair.

32. On April 24, 2017, Singhal also requested an automatic door for the door to the lab where she worked.

33. On April 25, 2017, Sandra Dunn (Human Resources) emailed Singhal indicating that BCM would not change the front entrance allegedly because the building is a "Historical building." Such a reason to refrain from adding automatic doors is improper, especially considering it would have been reasonable to automate the doors, and not an undue burden.

34. Instead, Dunn offered an unworkable alternative that placed Singhal in physical danger and required her to maneuver through construction.

35. On May 1, 2017, Dunn emailed several BCM individuals, including Martin (Marty) Weick asking about Singhal's request to have automated the lab doors.

36. That same day, Weick sent an email to Sreekumar, specifically stating: "Rock Morille the VP of Facilities estimates it will cost about $7,000 to convert your 120D glass doors to an auto opening system.  Rock declined to pay for the upgrade, and says it is a department problem.  I talked to Bert about spending that much money and he indicated that the issue was yours to resolve, as you hired this individual."  Later that day, Sreekumar came to Singhal and told her that his boss Bert O'Malley (BCM's chair and department head) called him and shouted at him for hiring disabled people.

37. The door was never modified to become automated.  Essentially, BCM refused to pay $7,000 to accommodate Singhal's request.

38. Also, in early May 2016, Singhal was injured by the Alkek building's automatic doors when the doors closed too quickly on her wheelchair and shoulder.  She reported this to Sandra Dunn on May 3, 2017.

39. Later that same day, Michael Stephens (BCM's Director of Facilities) acknowledged that the Alkek entrance door is "not working to specifications" and that a contractor would be called to fix it.

40. In late May 2017, Sreekumar berated Singhal about being potentially liable based on ramifications of her medical issues.

41. Sreekumar refused to take steps to automate the lab door.  This is apparently because he did not want the department or his lab to spend the $7,000.

42. On June 2, 2017, Singhal emailed Dunn indicating she has trouble using the door manually and has not been doing well.  Because of Sreekumar's treatment of her, she also raised concerns about Sreekumar being involved.

43. Dunn offered to meet with Singhal to show her the issues with the door.

44. On June 21, 2017, Dunn informed Singhal that she made a request to get the automatic door opener installed. But the door was never automated.

45. On July 11, 2017, Dunn informed Singhal that "the college is working on a resolution to the door," and then proceeding to ask her about her job duties and other areas that she accesses.

46. On July 27, 2017, Dunn again informed Singhal that she's still working on her request to automate the door.

47. On September 5, 2017, Singhal followed-up, asking about the status of the door, and Dunn responded the next day confirming that the automatic door had not yet been installed.

48. On September 13, 2017, Singhal emailed Sreekumar, asking for accommodations due to symptoms associated with her medical conditions.

49. On November 1, 2017, Singhal again emailed Sreekumar, asking for accommodations due to symptoms associated with her medical conditions.

50. On November 15, 2017, Singhal was informed that her appointment as a postdoctoral associate would end on February 28, 2018 and not be renewed.

51. Singhal periodically asked for accommodations before this and during the remainder of her employment at BCM, but Sreekumar did not attempt to reasonably accommodate her.

52. Sreekumar berated, shouted at, undermined, and treated Singhal unprofessionally, and with less regard than other non-disabled lab members. He would arbitrarily belittle her and her work in front of other employees.

53. Finally, on December 8, 2017, Dunn informed Singhal that the doors to the lab are allegedly ADA compliant, but that Singhal's request to have them automated "can be done at a cost of $7,000 to $10,000. However, since you now have only until February 2017 to work in that lab, the decision was to allow you to stay home so you could focus on securing another job."

54. Despite Singhal's ongoing requests to Dunn about the door, BCM never automated the door.

55. BCM's failure to automate the door worsened Singhal's health and symptoms associated with her medical conditions.

56. Therefore, BCM forced Singhal to stop working and essentially got rid of its problem rather than fulfill its obligations to assist people with disabilities.

57. By terminating Singhal, BCM did not need to automate the door.  It also apparently believes that the $7,000 cost of automating the door allows it to discriminate against people with certain disabilities.

58. Based on BCM's experiences with Singhal and communications from BCM, it appears BCM will take steps to avoid hiring people with certain disabilities in the future.

59. In December 2017, Singhal contacted Paul Klotman (President, CEO, and Executive Dean at BCM), seeking to speak to him about disability rights at BCM.

60. In response, Claire Bassett (VP of Communications & Community Outreach) offered to discuss with Singhal.

61. Singhal and Bassett did in fact meet on December 13, 2017, where Singhal discussed her concerns.  Bassett indicated she would take her concerns up with leadership.

62. On January 10, 2018, Singhal followed-up with Bassett to check on the status of her complaint.

63. On January 22, 2018, Bassett informed Singhal that a meeting was held to discuss her issues in which they allegedly "discussed a number of ways to provide [her] with support."  Bassett informed Singhal that Dane Friend (VP of Human Resources) would contact her, and in fact copied Friend on the email.

64. BCM never shared with Singhal any of the alleged "number of ways" that it could have provided her with support.

65. Despite repeated requests and attempts to meet with Friend, Friend made no attempts to follow-up with Singhal nor otherwise substantively discuss her concerns about her treatment.

66. On January 31, 2018, Singhal met with O'Malley, informing him that she had been discriminated against based on her disability, and essentially asking why it was so difficult to get accommodations as a disabled employee. O'Malley disregarded Singhal's concerns and told her that her concerns are not department issues. He also said that the department is not concerned about disability issues, but it is a school issue.

67. Therefore, O'Malley's explanation was that disability-accommodation issues are the responsibility of the school. This explanation directly contradicted Weick's May 1, 2017 email indicating that the disability-accommodation issue is "a departmental problem."

68. O'Malley also confirmed that the department does not enforce the school's policies.

69. Singhal's last day at BCM was February 28, 2018, and she made a final attempt to try to discuss with Friend, but Friend did not respond to her until a couple hours before her employment was finally over.

70. The next day (after Singhal's employment had ended), Friend and Singhal had a phone call, whereby Singhal discussed some of her concerns. However, Friend never explained why BCM acted the way it did and never relayed the alleged "number of ways" that BCM could have provided her with support.

71. BCM is obligated to comply with disability-related laws under section 504 of the Rehabilitation Act.

72. BCM did not adequately train Dunn on disability-related employment laws and policies.

73. BCM did not adequately train Weick on disability-related employment laws and policies.

74. BCM did not adequately train Martin on disability-related employment laws and policies.

75. BCM did not adequately train Sreekumar on disability-related employment laws and policies.

76. BCM did not adequately train Friend on disability-related employment laws and policies.

77. BCM did not adequately train Klotman on disability-related employment laws and policies.

78. BCM did not adequately train O'Malley on disability-related employment laws and policies.

79. BCM did not act in good faith.

80. BCM's unlawful actions were willful and/or committed with reckless disregard of the law.

81. BCM's actions were committed with malice.

82. BCM's unlawful actions caused Singhal to suffer mental anguish, pain and suffering, damage to her reputation, loss of earning capacity, loss of professional standing, loss of enjoyment of life, inconvenience, lost back pay, loss of benefits, and other damages.

## VI. CAUSES OF ACTION

83. Singhal hereby incorporates, by reference, the preceding paragraphs as if fully set forth herein and asserts the following causes of action under section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794, 794(a).

### A. Disability discrimination

84. BCM discriminated against Singhal based on her disability when decided to terminate her employment.

### B. Disability discrimination – failure to accommodate

85. BCM failed to accommodate Singhal's disability and/or otherwise failed to engage in an interactive process.

### C. Disability retaliation

86. BCM retaliated against Singhal for exercising her rights. Specifically, BCM retaliated against Singhal for complaining about the way she was treated based on her disability and for seeking accommodations.

## VII. JURY DEMAND

87. Singhal demands a trial by jury.

## VIII. DAMAGES

88. As a result of the above mentioned actions, Singhal seeks the following damages:

   a. Back pay;

   b. Loss of benefits;

   c. Loss of earning capacity;

   d. Reinstatement or, in the alternative, front pay;

   e. Loss of enjoyment of life;

   f. Inconvenience;

   g. Injunctive relief;

   h. Mental anguish and emotional distress;

   i. Mental and emotional distress due to the physical injuries caused by BCM;

   j. Compensatory damages;

   k. Punitive or exemplary damages;

   l. Reasonable and necessary attorneys' fees;

   m. Court costs;

   n. Prejudgment and post-judgment interest;

   o. Any and all other damages and/or relief, equitable or otherwise, to which Singhal may be entitled under federal law.

## IX. PRAYER

Wherefore, premises considered, Singhal respectfully prays that BCM be cited to appear and answer herein and that upon a final hearing of this action, judgment be entered for Singhal against

BCM for damages in an amount within the jurisdictional limits of this Court, which shall include all above mentioned damages and any other relief, at law or in equity, to which Singhal may be entitled.

        Respectfully submitted,

        SUD LAW P.C.

        */s/ Nitin Sud*
        Nitin Sud
        State Bar No. 24051399
        Federal ID No. 611307
        6750 West Loop South
        Suite 920
        Bellaire, Texas 77401
        Phone: 832-623-6420
        Fax: 832-304-2552
        Email: nsud@sudemploymentlaw.com

        *Attorney for Plaintiff*