United States District Court
Southern District of Texas
**ENTERED**
April 07, 2021
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| NEHA SINGHAL, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:19-CV-1362 |
| | § | |
| BAYLOR COLLEGE OF MEDICINE, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court are cross motions for summary judgment and motions to strike. (Docs. 26, 28, 38, 39, 45, 53.) After considering the motions, the responses thereto, and all applicable law, the Court concludes: (1) Baylor is entitled to summary judgment on Singhal's discrimination claim, (2) Baylor is entitled to summary judgment on Singhal's retaliation claim, (3) Baylor is entitled to summary judgment on Singhal's failure-to-accommodate claim as to its decisions within Sreekumar's lab and as to its decisions regarding the Cullen door, (4) neither party is entitled to summary judgment on Singhal's failure-to-accommodate claim as to Baylor's decisions regarding the lab door, (5) Singhal is entitled to summary judgment on Baylor's undue hardship, after-acquired evidence, and waiver/estoppel/laches defenses, (6) Singhal is not entitled to summary judgment on Baylor's failure-to-mitigate defense, and (7) Baylor is entitled to summary judgment on Singhal's request for compensatory and punitive damages. As such, Singhal's Motion for Partial Summary Judgment (Doc. 26) is **GRANTED IN PART AND DENIED IN PART**, and Baylor's Motion for Summary Judgment (Doc. 28) is **GRANTED IN PART AND DENIED IN PART**. The Motions to Strike and Objections (Docs. 38, 39, 45, 53) are **GRANTED IN PART AND DENIED IN PART**, as articulated in more detail below.

1

## I.     BACKGROUND

### A.  Overview of Singhal's Employment with Baylor

From November 2014 to February 2018, Plaintiff Dr. Neha Singhal was employed by Defendant Baylor College of Medicine ("Baylor") as a postdoctoral research assistant. (Doc. 26-1 ¶ 2.) During this time, she worked in two labs, first under Dr. Jim Martin and, beginning in January 2017, under Dr. Arun Sreekumar. (*Id.*) The relevant allegations in this matter stem largely from the second half of Singhal's employment with Baylor, during the time she worked in Sreekumar's lab. In 2016, Singhal was diagnosed with Ehlers-Danlos Syndrome ("EDS"), a rare genetic connective tissue disorder which substantially limits her ability to walk, stand, climb stairs, and perform repeated motions; puts her at high risk of joint dislocations; and leads her to experience bouts of pain, headaches, and dizziness. (*Id.* ¶ 3.) While she experienced these symptoms throughout her employment with Baylor, they worsened beginning in 2016 which led her to begin using a wheelchair more frequently. (*Id.*)

In October 2016, Singhal's appointment in Martin's lab ended, and she was in the process of searching for a new job. (Singhal Dep. at 64–65.)[1] During Singhal's job search, and at her request, Baylor continued to pay her and employ her to allow her to maintain health insurance. (*Id.* at 71–73.) She interviewed for and ultimately accepted a job in Sreekumar's lab. (*Id.* at 96; Doc. 28-2 at 146–49.) Singhal's appointment letter to the Molecular and Cellular Biology ("MCB") Department, within which Sreekumar's lab was housed, indicated that her position would last from January 2017 through July 2017, a period of six months. (Doc. 43-34.) In May 2017, Sreekumar

---

[1] Portions of Singhal's December 19, 2019 Deposition are located at Doc. 28-2 (Exhibit A to Defendant's Motion for Summary Judgment), as well as Docs. 43-49 and 43-50 (Exhibits to Plaintiff's Response to Motion for Summary Judgment). For consistency, citations refer to the pagination of the deposition transcript itself; not to the pagination of any of the exhibit PDFs.

indicated that Singhal's appointment would be extended until at least February 2018, for which funding was available. (Doc. 43-35.) In November 2017, Baylor informed Singhal that her appointment would not be renewed after February 2018, and in December, Baylor informed Singhal that, while she would continue to be employed and paid until the end of her appointment (roughly three more months), she should stay at home and not come back to the lab to perform any additional work. (Docs. 43-18, 43-37.)

Throughout her time at Baylor and in particular during her time in Sreekumar's lab, Singhal requested a number of accommodations due to her chronic health conditions and physical disabilities. Baylor provided accommodations for some, but not all, of Singhal's requests. Some of the requests involved her work within Sreekumar's lab itself and some involved accessibility to that lab.

### B.  Singhal's Work in Sreekumar's Lab

Sreekumar states that, during her job interview, he asked Singhal whether she was "physically capable of doing the job" in his lab, which involved "wet bench work" (i.e., working with cell lines including tasks such as pipetting).[2] (Doc. 28-15 ¶ 5.) Sreekumar states that bench work, including pipetting, is an "essential function[] of a postdoctoral associate position because [it is] necessary to conduct research experiments in the lab." (*Id.*) There is no dispute that pipetting to some extent is an important part of Singhal's research projects. (*See, e.g.*, Singhal Dep. at 50.) Nevertheless, when interviewing for the position, Singhal told Sreekumar that "she had a health issue, which prevented her from doing the type of *extensive* pipetting that had been required of her

---

[2] Pipetting is a procedure to dispense microliter levels of liquids. The pipetting in Sreekumar's lab involves holding a micropipette device in one hand and using either one's thumb or index finger to push down on a plunger to collect the liquid, and then release the plunger to dispense the liquid. (Doc. 26-7 at 15–16.)

in Martin's lab." (Doc. 28-15 ¶ 5 (emphasis added).) The project in Sreekumar's lab for which Singhal was hired—known as the "UGT project"—involved some pipetting, but not as much as was required for the project in Martin's lab on which Singhal had previously worked. (*Id.*) Sreekumar thus hired Singhal with at least some knowledge that she would be able to perform only a limited amount of pipetting or other wet bench work. (*Id.*; *see also* Sreekumar Dep. at 131.)[3]

According to Singhal, her job duties in Sreekumar's lab changed over time. She recalls that she had initially discussed with Sreekumar the expectation that she would manage three to six cell lines at any given time. (Doc. 53-51 ¶ 2 ("Before joining Sreekumar's lab, our understanding was that I would have about three cell lines. . . . Based on the experiment [sic] that were to be done, it was my understanding that my essential job duties would not have included more than about three to six cell lines at a time.").) In his deposition, Sreekumar attested to being uncertain of how many cell lines at any given time Singhal maintained or was expected to maintain. (Sreekumar Dep. at 131.) However, he states that for the UGT project, Singhal would be expected to handle "two cell lines"—"LNCap and VCaP." (*Id.* at 61.)

Singhal states that, over time, her job duties increased to maintaining and working with 36 cell lines, which required an amount of pipetting that she was physically unable to do. (Singhal Dep. at 152–53; Doc. 53-51 ¶ 2.) Sreekumar recalls that Singhal told her at some point that "she had too many cells," and he says that while he did not personally verify that fact, he told Singhal to give some of her cells to the "Cell Culture Core" which could grow and maintain those cells for her. (Sreekumar Dep. at 61–62.)[4] Singhal recalls that, early in 2017, Sreekumar allowed someone

---

[3] Portions of Sreekumar's March 6, 2020 Deposition are located at Doc. 28-3 (Exhibit B to Defendant's Motion for Summary Judgment)

[4] The Cell Culture Core lab is a group of scientists and technicians who perform discrete tasks related to cell growth for other labs on campus. (Doc. 28-15 ¶ 9.)

named Mohan—the lab manager—to take over some of her cell lines when she said she had too many. (Singhal Dep. at 153.)

In the first half of 2017, Singhal had to miss work several times due to doctor's appointments, serious medical procedures, and chronic pain related to her EDS condition. (*See* Doc. 28-2 at 189–93.) But there is no indication in the record that, during this period, Sreekumar was dissatisfied with her work. On May 15, 2017, four months after she started, Sreekumar indicated that Singhal's employment would be extended at least another six months. (Docs. 43-35; 43-36.) Sreekumar states that this is because he discovered additional funds—the "Cancer Prevention Research Institute of Texas" ("CPRIT") grant—that had become available due to a technician leaving an associated lab. (Doc. 28-15 ¶ 10.) Thereafter, Singhal continued her work on the UGT project. (*Id.* ¶ 11.)

A little more than one week later, on May 23, Singhal provided to Baylor administrators a physician's note stating:

> Dr. Singhal is under my care on an ongoing basis for musculoskeletal disorder which places her at risk for injury. She has sustained an injury at work that requires temporary accommodation to allow healing. Repetitive right [sic] including use of the pipette needs to be limited. I recommend that for a period 2 weeks she should not work more than 6 hours per day with allowance for breaks for increased pain. I will reexamine her after that time for medical clearance.

(Doc. 43-44.) The note was sent to Sreekumar, who called Singhal into his office for a meeting. (Doc. 43-51 ¶ 7.) Singhal recorded the meeting without Sreekumar's knowledge, during which Sreekumar expressed some displeasure that Singhal had sent the note to Human Resources without sending it to him first. He seems particularly perturbed by the implication that Singhal suffered an injury at work and that he could therefore be found liable. Characteristic of his comments are:

- "So, if you work now in the lab, and if something happens, I will be sued. . . . This was not at work." (Doc. 43-45 at 1–2.)

- "And the second thing I'm concerned is that repetitive use means if you don't stop working

in the lab, which is what you're doing now, and something happens—the guy says where you were. You were in the lab, and then, I would be sued." (Doc. 43-45 at 3.)

- "[B]efore you see this letter and forward it to OHP, and it goes all over the place and comes back to me, you should have shown me the letter. I would have changed the verbiage. I would have told you to rewrite this. I'm not going to be responsible for—I cannot take this injury at work." (Doc. 43-45 at 5.)

- "I don't want to see this [letter]. The reason being that I'm not responsible for this one." (*Id.* at 3.)

- "I don't want to get involved in all this [sic] unnecessary headaches." (*Id.* at 3.)

- "So, if something happens, it should be me who should be the first point of contact. And then, I'll have to tell you who to go and meet with." (*Id.* at 27.)

At the same time, Sreekumar expressed a desire to accommodate Singhal's health condition within the lab, suggesting that someone named Judy[5] take over all of Singhal's cells for her, and that Sreekumar would pay for it. (*Id.* at 6.) He went on to say that he was "okay with [Singhal] taking every cell in [her] incubator and giving it to Judy," which would leave Singhal with "no stem cell culture whatsoever." (*Id.*) More generally, he said that he "underst[ood] that [Singhal] need[ed] to take rest," but at the same time was concerned about "complet[ing] that part of the work that has to go back to the grant." (*Id.*) Singhal represents that she became "scared" after the meeting, and that Sreekumar was "very angry and belligerent." (Doc. 43-51 ¶ 8.) Based on the transcript and the audio recording, the Court disagrees with this latter characterization of Sreekumar's statements though of course not with what Singhal may have subjectively felt. (Doc. 43-46.)

According to Sreekumar, following this meeting, he allowed Singhal to reduce her workload to six hours a day as suggested in the doctor's note and allowed Singhal to manage her own work schedule without requiring that she log her hours. (Doc. 28-15 ¶ 9.) Sreekumar further

---

[5] Judy is someone who works at "Core Lab." (Singhal Dep. at 506.) Singhal maintains that she would have been able to utilize Core Lab services for growing cells but not for generic maintenance. (*Id.* at 506–08.)

states that, on multiple occasions thereafter, Singhal "miss[ed] work without any disciplinary repercussion when she felt weak or ill because of her medical condition." (*Id.*) Singhal disputes this, stating that Sreekumar in fact "micromanage[d]" her "more so than other post-docs" and did not reduce her workload based on the May 23 doctor's note (Doc. 43-51 ¶ 11.) She also claims that Sreekumar failed to address her requests in other ways, such as by not dividing up her pipetting work into chunks of time which were feasible for her but instead having her perform pipetting continuously for multiple hours. (Singhal Dep. 425:13–426:12.)

As to whether Sreekumar allowed Singhal flexibility in her hours and assigned lab technicians to assist with her work, the record belies some of these statements in Singhal's Second Declaration. For example, Singhal acknowledged in her deposition that on numerous occasions, Sreekumar allowed her to set her own hours without apparent repercussion. (Singhal Dep. at 242–261.) Similarly, in an e-mail dated November 1, Singhal e-mailed Sreekumar requesting flexible hours, stating: "I know you had in the past told me I can manage my own time, I just want to make sure you are still ok with this. I will still do all the work. . . . I might just come at odd hours as and when I am feeling better and not too dizzy." (Doc. 28-2 at 205.) Thus, contrary to Singhal's apparent recollection in her July 10, 2020 Declaration (Doc. 43-51), there is no concrete evidence in the record other than her own later statements that Sreekumar had a history of micromanaging Singhal; to the contrary, the record indicates that in November 2020, Singhal acknowledged that Sreekumar had a history of allowing her flexible hours.

In the second half of 2017, Singhal's condition and health appeared to worsen substantially as a result of her condition. For example, September 13, 2017, she e-mailed the following to Sreekumar after setting up an experiment:

> My right arm, ribs cage and elbow were [in] so much pain after that, the doctor had to give me steroids so that I could harvest the cells (otherwise, I wouldn't have been able to do it

at all). Taking steroids help in short term but they have negative effect on my medical condition/health if done repeatedly. As you know due to my medical condition, the strain of repeated motion of cell culture and pipetting is very difficult for me to handle especially now. I will need help with my experiments going forward. Could you please provide me with accommodation for my disability, so that I am able to continue to do the experiments without hurting myself[?]

(Doc. 28-2 at 204.) She specifically requested that someone in the lab help her with RNA extraction. (*Id.*) That day, Singhal, Sreekumar, and two other members of Sreekumar's lab—Uttam Rasaily[6] and Stacy Lloyd—had a meeting, which Singhal recorded. (Doc. 28-2 at 253–257.) Sreekumar expressed concern about meeting a November deadline for the UGT project and sought to find a way to push the project forward while accommodating Singhal. (*Id.* at 253.) Singhal stated that she was unable to do too much pipetting, and Sreekumar suggested that she handle the "cell culture only," while Rasaily would handle the other cell line. (*Id.*) He also suggested that Singhal handle "ordering"[7] which was ordinarily one of Lloyd's duties, and that Lloyd would as a result have more time for lab management. (*Id.*) The reasoning for this switch was that Singhal would not have to move around to do lab ordering. (*Id.*) As to the cell culture, for which Singhal would be responsible, Sreekumar proposed "giving the cell culture to the Core [Lab],"[8] and having Rasaily to do "treatments" on the cell culture, as long as Singhal "overs[aw] the project and ma[de] sure it r[an]." (*Id.* at 254.) Overall, the record shows that Sreekumar sought to reduce the amount of pipetting Singhal would have to do to a minimum, while still keeping her engaged on the project.

The next month, Sreekumar reassigned her to a new project—the "SRC2 project"—which would involve less pipetting. (Doc. 28-15 ¶ 12–13.) Sreekumar communicated this to Singhal at a

---

[6] Singhal had previously requested that Rasaily assist her with RNA extraction on April 21, 2017. (Doc. 28-2 at 192.)

[7] In a December 4, 2017 e-mail to Baylor administrators, Sreekumar states that he thought the ordering work was mishandled. (Doc. 28-2 at 204.)

[8] At another point in the conversation, Sreekumar emphasizes that if Singhal felt that the cell culture work was too much, she should give some of the work to Judy at Core Lab. (Doc. 28-2 at 255.)

meeting on October 4, 2017, which Singhal also recorded. (Doc. 28-2 at 238–249.) Specifically, Sreekumar told Singhal that she would remain a co-author on the UGT project paper, but that he wanted her to work on the SRC2 project instead, because the UGT project was going to require starting a different cell line, which he understood would have been too much bench work for Singhal. (Doc. 28-2 at 238.) Singhal felt that this decision amounted to being "punished." (*Id.* at 239.) Sreekumar responded that to the contrary, he was doing his best to balance Singhal's health concerns with finding a project that would be appropriate for her, all while wanting to push the UGT project forward. (*Id.*) Relatedly, in her deposition, Singhal stated that the 36 cell lines, which she cited as a primary source of her difficulty in the lab (Doc. 43-51 ¶ 1), were tied to the UGT project and not the SRC2 project. (Singhal Dep. at 441.) At the same time, she stated that after moving to the SRC2 project, she was "still taking care of some of the UGT cell lines" because others in the lab did not know how to, although she does not remember how many cell lines. (Singhal Dep. at 442.)

On November 1, as noted above, Singhal told Sreekumar she had started a new medication that made her dizzy and requested flexible hours for the "next few weeks." (*Id.* at 205.) Two weeks later, on November 15, Baylor informed Sreekumar that her appointment would not be renewed and would thus end on February 28, 2018. (Doc. 43-37 at 2.)[9] On November 17, Singhal e-mailed Dunn stating that her "hand, arm and shoulders [were] doing much worse" and that she was "unable to do bench work." (Doc. 28-2 at 179.) That day, she also e-mailed Sreekumar stating that she "need[ed] help with bench work experiments" due to shoulder pain, and asked for Rasaily, a lab technician, to assist with her current experiment. (Doc. 28-2 at 206.) Sreekumar assigned Preeti

---

[9] The e-mail to Singhal incorrectly states that she would be paid through February 28, 2017, but the actual date was February 28, 2018.

Purwaha, a Staff Scientist, to do so, but Singhal again asked for Rasaily specifically due to his experience with RNA extraction. (*Id.*) On December 4, Singhal told Sreekumar she wouldn't be able to do pipetting that day because of pain in her rotator cuff. (*Id.* at 207.) From December 4 through December 6, she exchanged e-mails with another member of the lab—Venkata Rao— outlining the details of the experiment; on December 6, she e-mailed Sreekumar stating that she "[would] need help again to collect the cells on Friday," and wouldn't be able to "trypsinize the cells," a process that "requires a lot of pipetting." (Doc. 28-2 at 209–12.)

That day, Sreekumar e-mailed the following to Caroline Kosnik, administrative associate for the MCB Department:

> Hi Caroline, As you can see from below, at this point Neha is unable to do any work in the lab due to her health. ls this something HR would look into to see if she is deemed medically not fit to do this work and hence can be asked to move on to her next job? I have asked others in the lab to help out but if they need to do everything then I don't see why Neha should be in the lab?

On December 8, Baylor e-mailed Singhal informing her that she would be paid through the end of her appointment in February 2018, but that she should not come into the lab any longer and instead focus on her job search. (Doc. 28-2 at 187.)

**C.  Singhal's Accessibility Requests**

In a separate but related vein, Singhal requested a number of accommodations related to her ability to get to and from her job—first to Martin's lab and later to Sreekumar's lab. In 2014 she requested a parking spot closer to campus than the one she would otherwise have been assigned, which Baylor provided and the cost of which Baylor eventually covered. (Singhal Dep. at 36–37.) In April 2017, after she began to use the wheelchair more frequently to get to and from the lab, Singhal asked Baylor to automate two doors: the front entrance to a building called Cullen (an external door) as well as the entrance to Sreekumar's lab ("door 120D" or "lab door"). (Doc. 28-2 at 161–62.) Singhal stated that it was difficult for her to simultaneously operate her

10

wheelchair and open the doors due to her muscle weakness. (*Id.*) These requests were received by Sandra Dunn, Baylor's Team Lead for Employee Relations. (*Id.*)

With respect to the Cullen door, Dunn first consulted with Rick Morille, Baylor's Vice President of Facilities, who explained that the entrance could not be easily automated because Cullen is a historical building. (Dunn Dep. at 37–38.)[10] Dunn told Singhal to instead use an alternative wheelchair-accessible entrance to the building, and Singhal did so. (Doc. 28-2 at 163; Singhal Dep. at 189–90.) On May 3, Singhal told Dunn that she was having difficulty with the alternative doors after-hours as well as a restroom door; Dunn contacted facilities immediately to fix them. (Doc. 28-2 at 165.) The next day, after facilities had fixed the restroom door, had called a contractor to repair the alternative entrance, and planned to schedule a "quarterly preventative maintenance schedule on all wheelchair access doors," Dunn let Singhal know and encouraged her to contact her again with any further issues. (*Id.* at 169.)

Door 120D proved to be more of a sticking point. These were glass doors which Singhal states she had difficulty opening and through which she had difficulty maneuvering her wheelchair. (Doc. 26-1 ¶ 4.) She also claims that the doorway would occasionally be blocked by empty boxes or trash, which made it especially difficult for her to open while in her wheelchair. (*Id.* ¶ 5.) While Singhal attests to having trouble with the doors, she has also described the doors as "not . . . heavy," relative to other doors. (Singhal Dep. at 211–12.) In any event, Dunn forwarded Singhal's April 2017 request to Morille, who stated that unlike the Cullen door, automating the lab door would be possible. (Doc. 26-9.) He estimated the cost of automating the doors to be $7,000 plus future maintenance costs—in his words: "The risk is that the door remains after this person

---

[10] Dunn's January 17, 2020 Deposition is located at Doc. 26-2 (Exhibit 2 to Plaintiff's Response to Motion for Summary Judgment).

leaves and it is forever a maintenance issue for my team." (*Id.*) Dunn forwarded Morille's response to Martin Weick, an administrator in the MCB Department, stating: "The department will need to accommodate [this] request." (*Id.*) Weick in turn forwarded the request to Sreekumar, indicating that since Facilities would not pay to automate the door, it was a "departmental problem" and up to Sreekumar to resolve, "as [he] hired this individual." (Doc. 26-10.) Sreekumar spoke with Singhal and, according to his declaration, was led to believe the door was not a major issue, as he observed her opening and closing the door manually. (Doc. 28-15 ¶ 14.)

However, a month later, in June, Singhal followed up with Dunn explaining that Sreekumar did not have the funds to automate the door, and that she continued to experience pain and weakness when she attempted to open the door manually herself. (Doc. 26-11.) Dunn responded saying: "I will work to get this done." (*Id.*) Dunn forwarded Singhal's follow-up request to Morille and Weick once again, this time cc'ing Baylor's in-house attorney Dane Friend, stating that this was a "reasonable request" and that the "Feds will require us to accommodate Ms. Singhal." (Doc. 26-12.) Later that week, Dunn met with Singhal to try to understand her difficulty with the door. (Doc. 26-13.) In a subsequent e-mail to Morille, Weick, and Friend, she stated that Singhal was "clearly having trouble with the door that she must exit and enter multiple times a day. In my view, her request for an automatic door opener is reasonable. The doors are all glass and heavy. She is reporting that opening the doors has caused her to have lasting muscle deterioration." (Doc. 26-14.) At the same time, Morille was attempting to evaluate the door to understand if it "[met] the current ADA code." (*Id.*) According to Morille, the door required three-and-a-half pounds of force to open. (Doc. 28-17 ¶ 4.)

In July, Dunn e-mailed Singhal twice to indicate that Baylor was working on a resolution to automating the door. (Docs. 26-15, 26-16.) In September, Dunn e-mailed Singhal to ask whether

the door had been automated, to which Singhal replied that it had not. (Doc. 26-17.) On November 17, two days after Baylor e-mailed Singhal informing her that her appointment would not be renewed after the following February, Singhal once again e-mailed Dunn to ask about the door. (Doc. 26-19.) Dunn responded saying she was sorry that the door had not been automated and would try to find out why it had not been automated yet. (*Id.*) That day, she e-mailed Weick, Morille, and Friend explaining that while the door was an expense, Baylor "was required to accommodate," pointing out that Singhal had requested the accommodation over six months ago, in April. (Doc. 26-20.) In response, Weick stated that Baylor had gone into a "holding pattern when Dr. Sreekumar indicated that he was not going to renew Singhal's Postdoctoral appointment because of funding issues in the lab," and that the combination of the decision not to renew her appointment with the tentative decision to tell her not to return to the lab for the remainder of her appointment "kind of eliminates the door issue." (Doc. 26-21.)

Dunn states that in a meeting on December 4, which Baylor asserts is privileged due to the presence of in-house counsel Dane Friend, she learned Singhal's appointment would be ending February 2018 and thus formed the opinion that automating the door was neither reasonable nor necessary. (Doc. 28-2 at 187.) In one of its interrogatories, Baylor confirmed that the decision not to automate door 120D was made at that meeting, over seven months after Singhal requested the accommodation and after Baylor decided not to renew her appointment. (Doc. 26-24 at 4; Doc. 26-23.)

By February 2018, Singhal's condition appears to have worsened to the point where she lacked confidence in her ability to do almost any laboratory job. On February 8, she met with Bonnie Weisman, Baylor's Executive Director for Human Resources, to discuss potential career options. (Singhal Dep. at 274–75.) Singhal recorded this conversation. (Doc. 28-2 at 215–36.) In

13

that meeting, Singhal stated that she felt that research positions in general would not be possible due to her condition. (Doc. 28-2 at 217.) More specifically, she said that at the moment she felt that she "just can't do any of those," referring to research jobs such as being a lab technician, scientist, or a postdoc. (*Id.* at 223.)  She told Weisman that her EDS had grown so severe that she had difficulty lifting a bag or feeding herself. (Doc. 28-2 at 231.)

### D.  Singhal's Coworkers

Finally, Singhal alleges that Sreekumar treated her less favorably than one of her coworkers, Stacy Lloyd, and that she was replaced by one of her coworkers, John Arnold. With respect to Lloyd, Singhal attests that Lloyd had fewer cell lines to handle and that the lab technicians helped Lloyd more than they helped Singhal. (Singhal Decl. ¶¶ 4–5; Singhal Dep. at 472:7–473:15.) With respect to Arnold, Singhal points to a March 8, 2018 e-mail from Sreekumar stating simply that "James [Arnold] will now replace Neha." (Doc. 43-42.) Sreekumar sent this e-mail after learning that the extension of the CPRIT grant, which funded Singhal's position, was to be extended through August 2018. At the time, Arnold was a graduate student (i.e., not yet a postdoc). Sreekumar in his deposition states that his e-mail did not mean that Arnold was literally "replacing" Singhal, given their different positions and work duties. (Sreekumar Dep. at 196–98.) According to Sreekumar's deposition testimony, Arnold performed mass spectrometry on the same project that Singhal did, while Singhal did not perform that type of work. (*Id.*) Thus, while the funding for Arnold's position in the lab was now being drawn from an extension of the grant that had previously funded Singhal, Sreekumar claims that Arnold did not take over Singhal's job duties. (*Id.*)

## II.    LEGAL STANDARD

Summary judgment is warranted when the evidence reveals that no genuine dispute exists

14

regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019). A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*, 271 F.3d 624, 626 (5th Cir. 2001). To be genuine, the dispute regarding a material fact must be supported by evidence "such that a reasonable jury could resolve the issue in favor of either party. See *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013). The court should construe "all facts and evidence in the light most favorable to the nonmoving party," and must "avoid credibility determinations." *Nall*, 917 F.3d at 340.

### III.   ANALYSIS

Singhal's claims arise under Section 504 of the Rehabilitation Act ("Rehab Act"), which prohibits discrimination against disabled persons in programs or activities—including employment—which receive federal funds. 29 U.S.C. § 794. (Doc. 2 ¶ 4.) Singhal alleges three distinct causes of action in violation of the Rehab Act: (1) Baylor discriminated against her by terminating her employment, (2) Baylor retaliated against her for requesting accommodations related to her disability, and (3) Baylor failed to reasonably accommodate her. (Doc. 2 ¶¶ 84–86.) In its answer, Baylor raised several defenses that are relevant here: mitigation, undue hardship, after-acquired evidence, waiver, estoppel, and laches. Baylor has moved for summary judgment on all claims. Singhal has moved for summary judgment on her failure to accommodate claim and on Baylor's defenses, listed above.

#### A.  Claim One: Discrimination

Both the Rehab Act, 29 U.S.C. § 794(a), and the ADA, 42 U.S.C. § 12112(a), "prohibit

discrimination on the basis of an employee's disability." *Amsel v. Tex. Water Dev. Bd.*, 464 F. App'x 395, 399 (5th Cir. 2012). With exceptions not relevant here, "[t]he Rehabilitation Act adopts the standards used in determining claims under the ADA." *Id.*; 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under . . . the Americans with Disabilities Act, . . . as such sections relate to employment."). In bringing a claim for disability discrimination, an employee must either offer direct evidence of discrimination or proceed under the *McDonnell-Douglas* burden-shifting framework. *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009). Under that framework, a plaintiff must first establish a *prima facie* case of discrimination: that (a) she was disabled, (b) she was qualified for her job, (c) she was subjected to an adverse employment action on account of her disability or the perception of her disability, and (d) she was replaced by or treated less favorably than non-disabled employees. *Id.* Once the plaintiff proves a *prima facie* case, the employer in turn "must articulate a legitimate, nondiscriminatory reason for terminating [the employee]." *EEOC v. LHC Grp.*, 773 F.3d 688, 694 (5th Cir. 2014). "Finally, the burden shifts back to the [plaintiff] to show that [the defendant's] proffered reason is pretextual." *Id.*

The parties do not dispute the first element: Singhal is and was at all relevant times disabled within the meaning of the ADA. Baylor argues instead that it is entitled to summary judgment because Singhal has not carried her burden as to the other three elements of her *prima facie* case. Moreover, Baylor has offered a nondiscriminatory reason for terminating Singhal. Singhal argues that there is a genuine factual dispute as to each of those elements and as to whether Baylor's proffered reason for terminating her is pretextual.

To be "qualified" under the ADA, an employee must be able to "perform the essential

16

functions" of the job, "with or without reasonable accommodation." 42 U.S.C. § 12111(8). In other words, to avoid summary judgment, Singhal must raise a genuine issue of material fact as to whether either "(1) [she] could 'perform the essential functions of the job in spite of [her] disability,' or, if she could not, (2) that 'a reasonable accommodation of [her] disability would have enabled [her] to perform the essential functions of her job.'" *LHC Grp.*, 773 F.3d at 697 (citation omitted). "A function is essential if it bears more than a marginal relationship to the employee's job." *Id.* (internal quotation marks and citation omitted). This is an inherently fact-driven inquiry; the Fifth Circuit has observed that "[f]act-finders must determine whether a function is 'essential' on a case-by-case basis." *Credeur v. Louisiana*, 860 F.3d 785, 792 (5th Cir. 2017) (citation omitted).

Through regulations, the EEOC has identified seven "non-exhaustive factors to guide the essential-function inquiry." *Id.* They are: (1) the employer's judgment, (2) written job descriptions, (3) the amount of time spent on the job performing the function, (4) the consequences of not requiring the employee to perform the function, (5) the terms of a collective bargaining agreement, (6) the work experience of past employees in the job, and (7) the work experience of employees in similar jobs. *Id.*; 29 C.F.R. § 1630.2(n)(3). Courts should "give greatest weight" to the first factor—the employer's judgment—but the Fifth Circuit has cautioned that such deference should not be "blind," and that "employees can be good sources of information regarding their day-to-day activities and the prerequisites for success on the job." *Credeur*, 860 F.3d at 792–93. Still, an employee's "'unsupported testimony that she could perform [essential] job functions' does not create a genuine dispute of fact to preclude summary judgment." *Id.* (citation omitted). The ADA provides some examples of "reasonable accommodations," such as:

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or

modifications of examinations, training materials or policies, the provision of qualified
readers or interpreters, and other similar accommodations.

42 U.S.C. § 12111(9)(B). While the ADA does require an employer to reasonably accommodate
a disabled individual's needs, it "does not require an employer to relieve an employee of any
essential functions of his or her job, modify those duties, reassign existing employees to perform
those jobs, or hire new employees to do so." *LHC Grp.*, 773 F.3d at 698.

For her discrimination claim, the relevant time for determining whether Singhal was a
qualified employee is the period when she suffered the allegedly adverse employment action, that
is, when her contract was not renewed in November 2017. Baylor argues that Singhal was not
qualified for her job because at that time, she was "unable to complete bench work" and repeatedly
asked Sreekumar to "reassign her bench work to other employees, claiming she was too weak to
complete the work herself." (*See* Doc. 28 at 16–17.) In response, Singhal argues that there is a
factual dispute as to what her essential job duties were, and as to whether she was able to perform
them. (Doc. 43 at 19.) On this count, the Court agrees with Baylor.

Bench work, at least in some form, was clearly an essential part of working in Sreekumar's
lab. Singhal has provided no evidence, nor does she argue that, for instance, there were postdocs
that worked on similar projects to hers who had no bench work. Rather, the crux of Singhal's
argument seems to be that her essential job duties included maintaining only three to six cell lines,
which she was always able to do, and that she was only unable to do additional bench work outside
the scope of those essential duties.[11] Indeed, when Singhal was hired, she and Sreekumar seemed

---

[11] Singhal states this as a fact in her second declaration and throughout her deposition. (Doc. 53-
51 ¶ 2.) Still, the Court cannot accept Singhal's testimony alone. *See Credeur*, 860 F.3d at 793
("[A]n employee's unsupported testimony that she could perform her job functions . . . does not
create a genuine dispute of fact to preclude summary judgment."). The record is also muddled as
to exactly how many cell lines Singhal had at any given point in time; neither she nor Sreekumar
provide helpful evidence on this point, and there is also no documentary evidence or testimony
offered from, e.g., other postdocs who worked in Sreekumar's lab, on this question.

to be on the same page that her job would necessarily involve some pipetting, though not the extensive amount that was previously required of her in Dr. Martin's lab. In his deposition, Sreekumar stated that the UGT project would involve handling "two cell lines." The fact that Sreekumar hired Singhal with knowledge of her disability and limited ability to perform extensive pipetting provides evidence that Singhal's essential job duties included less rather than more pipetting. But such circumstantial evidence does not definitely resolve the question of how many cell lines Singhal would have been expected to maintain, or whether that is even the relevant inquiry in determining Singhal's essential job duties. The only written description of Singhal's job description is Baylor's response to Singhal's Interrogatory No. 9. There, Baylor characterized Singhal's job description as encompassing much more than just wet bench work. It included "handling projects on cancer metabolism," "designing and executing experiments," "analyzing data," "interpreting results," "creating follow-up experiments," "characterization of altered metabolic pathways," and other categories which seem to consist of bench work. (Doc. 26-30 at 4–5.)

Based on this written description and the record, the Court declines to find that there was a specific number of cell lines that constituted Singhal's essential job duties. Indeed, this does not seem to be how researchers in the lab conceptualized their work, given that resources were available such as the Core Lab to offload bench work as and when postdocs needed. Rather, the Court takes a broader view of what constituted Singhal's essential job duties and finds the relevant measure to be, at any given point in time, whether she was able to generally conduct, manage, and oversee the experiments associated with the project(s) to which she was assigned, with accommodations. Some of her essential duties involved wet bench work such as pipetting, and some did not, such as designing experiments, analyzing data, and interpreting results.

Put this way, while Singhal was capable of performing her essential job duties in the first half of 2017—which is underscored by her reappointment for another six-month term in May— the evidence demonstrates that she was unable to perform at least some essential job duties by November 2017, when Baylor decided not to renew her contract. The Court particularly notes that each time Singhal explained to Sreekumar that she had too much work or that she was unable to do bench work due to pain in her hands or joints, Sreekumar offered various solutions, but even with these accommodations, Singhal had difficulty completing bench work.[12] In early 2017, Singhal states that she had 36 cell lines which was too many, and Sreekumar told her to offload some of them, which she did. In April, she requested assistance with an RNA extraction experiment, and Sreekumar said that Rasaily would be able to assist. During the May 23 meeting, Sreekumar suggested that Singhal give "all her cells" to Core Lab, and that he would pay for it. He also reduced Singhal's hours, and allowed her a flexible work schedule, something she later acknowledged. In September, when Singhal started experiencing more severe symptoms and told Sreekumar that "pipetting [was] very difficult for [her] to handle" and that she would "need help with [her] experiments going forward," Sreekumar convened a meeting with others in the lab to strategize how to offload bench work and reassign Singhal to other tasks, while continuing progress on the UGT project. That day, Sreekumar also told Rasaily to assist Singhal with RNA extraction. The next month, Sreekumar switched Singhal to a different project—the SRC2 project—involving less bench work. But unfortunately, by late 2017 Singhal's symptoms had become so severe that she appeared mostly unable to do bench work, as she stated in her November 17, December 4, and December 6 e-mails to Sreekumar. Specifically, on November 17, she stated

---

[12] The Court's analysis on this issue overlaps with its analysis of Singhal's failure-to-accommodate claim as to Sreekumar's decisions within the lab, given that the threshold issue here is whether Singhal was or was not qualified for the position, with reasonable accommodations.

that she needed "help with bench work experiments," on December 4, she stated that she "[wouldn't] be able to do the pipetting today," and on December 6, she stated that she would also need the same kind of help with her next set of experiments. Singhal's statements in January to Weisman further indicated that she did not feel she was physically capable of doing almost any lab research work by that point in time.

In other words, Sreekumar provided Singhal with the types of accommodations recognized by the ADA—allowing for a part-time or modified work schedule, restructuring Singhal's job, and assigning her to new tasks and projects that reduced the amount of bench work she would have to perform. But even with these accommodations, Singhal had trouble carrying out at least some of the essential functions of working on or managing the experiments to which she was assigned. To be sure, there is no dispute that Singhal was able to analyze data or interpret results, which constituted some of her essential job duties. But there is also no dispute that around the time that Baylor decided not to renew her contract, she was having substantial difficulty with experiment-related tasks that can only be described as essential duties of her position. And in these later months, Singhal began to ask not only for accommodations as defined by the ADA such as flexible hours, assistance with discrete tasks, or even reassignment to a different project, but for a more fundamental modification of her duties within the lab. The caselaw makes clear that, while Baylor was required to provide accommodations to Singhal as to the former, Baylor was not required to relieve Singhal of, or even modify, these essential duties. *LHC Grp.*, 773 F.3d at 698.[13]

---

[13] On the issue of whether she was qualified, Singhal additionally asserts that "Baylor's refusal to reasonably accommodate Singhal actually caused her health to get worse." (Doc. 43 at 11.) She further asserts that "[t]he evidence also shows that Sreekumar made Singhal's job duties more difficult after she started asking for accommodations, rather than trying to accommodate her or even engage in an interactive process." (*Id.* at 12.) Neither of these statements is supported by citation to the record or to specific facts. In any event, the first assertion seems to go not to whether Singhal was qualified but to a different issue—Singhal's damages if she proves a failure to

Because the Court concludes that Singhal has not demonstrated a genuine dispute of material fact as to the first second element of her *prima facie* case, the Court concludes without reaching the remaining elements that summary judgment is warranted for Baylor on her discrimination claim.[14]

### B.  Claim Two: Retaliation

Courts analyze a retaliation claim under the same burden-shifting framework outlined above. First, an employee must make a *prima facie* showing that (a) she participated in a protected activity, (b) her employer took an adverse employment action against her, and (c) there is a causal connection between the protected activity and the adverse action. *Nall*, 917 F.3d at 348–49. If she does so, the employer must in turn provide a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 349. Finally, the employee must show that the proffered reason is in fact pretext. *Id.* As to the third prong of the employee's *prima facie* case—causation—the Fifth Circuit has stated: "Ultimately, the employee must show that 'but for' the protected activity, the adverse employment action would not have occurred." *Id.* Singhal clearly engaged in protected activity by requesting accommodations on numerous occasions, both from the Baylor administration and from Sreekumar. But Baylor has moved for summary judgment on the basis that Singhal cannot prove the remaining two prongs of her *prima facie* case as a matter of law. Even assuming that Singhal has met her summary judgment burden as to whether Baylor's non-renewal of her contract constitutes an adverse employment action, the Court agrees with Baylor that Singhal cannot show

---

accommodate claim. And the second assertion is belied by the record as explained in the preceding paragraphs. Sreekumar did engage Singhal in an interactive process, as evidenced by the transcripts of the May 23, September 13, and October 4 meetings, in addition to his e-mails to Singhal throughout 2017 in which he generally approved assistance for her experiments.

[14] The Court agrees with Baylor that Singhal has not pled a failure-to-hire claim. (*See* Doc. 2 ¶ 84 (alleging the basis for her discrimination claim as termination, not failure to hire or failure to promote); Doc. 51 at 13–14.)

causation, as a matter of law.

"A causal link is established when the evidence demonstrates that the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Id.* (internal quotations, modifications, and citations omitted). Singhal's retaliation claim arises from her May 2017 request, pursuant to a doctor's note, for a temporarily reduced workload.[15] Singhal argues that her May 23, 2017 meeting with Sreekumar discussing that note "is clearly indicative of Sreekumar's discriminatory animus towards Singhal's request for an accommodation." (Doc. 43 at 14.) Singhal additionally argues that the December 4 meeting—at which Baylor decided not to automate the lab door and (as Baylor argues) instead place her on a kind of paid leave under her appointment expired—provides further evidence of a causal connection between her requests for accommodation and the decision to not renew her employment contract. (Doc. 43 at 15.) The Court concludes that neither piece of evidence is sufficient to establish a genuine material fact as to the causation prong of Singhal's retaliation claim, and summary judgment for Baylor is warranted on that basis.

The May 23 meeting with Sreekumar is neither indicative of discriminatory animus in the way Singhal describes, nor is it sufficiently proximate in time to the decision not to renew Singhal's contract, which was made over five months later, in November. First, as detailed in this Court's factual summary of the case, during the May 23 meeting, Sreekumar did make a number of statements expressing displeasure that Singhal sent the doctor's note directly to Baylor's HR department, but the Court disagrees with Singhal's characterization of the audio as evidence of Sreekumar "berating" her. In the recording, Sreekumar expressed a specific concern that he would

---

[15] Singhal stipulates that she "is not claiming that her discussions or complaints to Kosnik, Dunn, or O'Malley form the basis of her retaliation claim." (Doc. 43 at 14 n.6.)

be held liable for the doctor's note, which stated that Singhal sustained an injury "at work," and which Sreekumar worried would in turn be interpreted as Singhal having sustained the injury in his lab, for which he would be responsible. Sreekumar also asked Singhal to send him copies of complaints she had previously sent to HR regarding automating the doors on Baylor's campus. But importantly, at the same time, he expressed a willingness to offer accommodations such as allowing others in his lab or in Core Lab to manage Singhal's cell lines. Further, his actions following the meeting demonstrate a repeated willingness to allow Singhal flexibility in managing her work and setting her own schedule. Singhal acknowledged this flexibility in her deposition. And the written record shows that each time Singhal asked Sreekumar for assistance with her experiments, he directed someone else in the lab such as Rasaily or Purwaha to assist with the relevant bench work. In sum, the record indicates that, on multiple occasions following May 23, Sreekumar attempted to accommodate Singhal, at least with respect to her work in the lab.[16]

Second, the Fifth Circuit has held that a months-long time period between engaging in protected activity and retaliation, without more, is insufficient to establish a causal link. *See, e.g.*, *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471–72 (5th Cir. 2002). Thus, even assuming for the sake of argument that the May 23 meeting evinces some kind of retaliatory intent on the part of Sreekumar or Baylor, that meeting, without more, cannot create a genuine dispute of material fact on the issue of causation. Similarly, Singhal has not provided any specific evidence that Baylor engaged in retaliatory action during or as a result of its December 4 meeting. Even if she did, such a claim would likely fail as a matter of law, because Baylor had communicated to Singhal its intent not to renew her contract prior to the meeting; Singhal in turn does not provide

---

[16] The issue of whether Baylor reasonably accommodated Singhal's request as to the lab door is distinct and discussed further below.

an adequate explanation of how that meeting would demonstrate a causal link between her requests for accommodation and the prior decision to let her go. Thus, Singhal has not established a genuine issue of fact as to whether Baylor terminated her "but for" her requests to Sreekumar for accommodations, and summary judgment is warranted in favor of Baylor on the retaliation claim.

### C. Claim Three: Failure to Accommodate

To prevail on a failure-to-accommodate claim, an employee must show: (1) they are a qualified individual with a disability, (2) the disability and its consequential limitations were known by the employer, and (3) the employer failed to make reasonable accommodations for those limitations. *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 247 (5th Cir. 2013) (citing *Feist v. Louisiana*, 730 F.3d 450, 452 (5th Cir. 2013)).

Singhal argues that Baylor failed to accommodate her in three distinct ways: (1) as to her work in Sreekumar's lab, (2) by deciding not to automate the Cullen door, and (3) by deciding not to automate the lab door. For all of these theories, Baylor does not dispute that it knew of Singhal's disability and consequential limitations. Rather, Baylor has moved for summary judgment on all three theories on the basis that Singhal cannot meet her burden as to the first and third elements— namely, that she was not a qualified individual, and that Baylor reasonably accommodated Singhal on all counts. Singhal in turn has moved for summary judgment as to the third theory only, claiming that the decision not to automate the lab door was unreasonable as a matter of law. The Court agrees with Baylor as to the first two theories but concludes that there is a genuine issue of material fact as to the reasonableness of Baylor's decision regarding the lab door; as such, summary judgment is warranted in neither party's favor on that issue.

As an initial matter, the Court finds that, unlike as to Singhal's discrimination claim, there is at least a genuine issue of material fact regarding whether Singhal was a qualified individual in

most of the relevant months during which she sought accessibility accommodations. Baylor cannot seriously dispute that Singhal was qualified for her job when she made the initial request, in April, given that Sreekumar extended her appointment a month later. It was only beginning in September or October that Singhal began to have difficulty completing bench work in a more sustained manner. Thus, at the time Singhal requested various accommodations—including the ones relevant here—and for at least several months after, Singhal has adduced evidence demonstrating that she was qualified for her job. The Court now analyzes the third element—whether Baylor reasonably accommodated Singhal—as to each theory.

"When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation." *EEOC v. AgroDistrib., LLC*, 555 F.3d 462, 471 (5th Cir. 2009) (citing 29 C.F.R. § 1603.9). In other words, "[t]he ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation." *Id.* Factors such as the cost of competing accommodations are relevant, as long as the provided accommodation is "effective." *Id.* An employer is not required to provide any accommodation that "would impose an undue hardship on the operation of its business." 29 C.F.R. § 1630.9(a).

### i. Singhal's work within Sreekumar's lab

The Court has detailed at length the accommodations that Sreekumar made as to Singhal's work within the lab itself, in Part III.A of this opinion. To summarize, in multiple instances, he allowed Singhal to set flexible hours, directed her to offload wet bench work either to the Core Lab or to lab technicians such as Rasaily or Purwaha or Venkata Rao, and suggested other projects and tasks within the lab that would limit the amount of her bench work. Singhal's own testimony, in the form of her deposition and declaration, are the only pieces of evidence offered to rebut these

facts. (*See* Doc. 43 at 13–14.) But the Court cannot credit statements in a declaration that are directly contradicted by other evidence, such as Singhal's later claim that Sreekumar micro-managed her. Similarly, Singhal's statement that December 2017 was the first time that Sreekumar had someone help her with experiments is directly contradicted by e-mail evidence in which he asks others in the lab to assist Singhal with experiments, dating back to April. For these reasons, the Court grants summary judgment in favor of Baylor on this particular failure-to-accommodate theory.

### ii. The Cullen door

Baylor also argues that it is entitled to summary judgment on the issue of its decision not to automate the Cullen entrance doors, given that it directed Singhal to use an alternative wheelchair-accessible entrance to the building. (Doc. 28 at 34.) In response, Singhal argues that the alternative was insufficient because it led to "delays, traveling longer distances, risk of injury, almost getting run over by a truck, navigating through construction, potential damage to her electric wheelchair if it was raining, and a door not functioning." (Doc. 43 at 5.)

The record does not support this characterization of Baylor's offered accommodation in this instance. Singhal agrees that she was able to use the alternative entrances, and, on rare occasion when needed, was able to open and use the Cullen door herself. (Singhal Dep. at 193–95.) There is also ample evidence in the record that, to the extent Singhal experienced difficulty with the other entrances and notified Baylor accordingly, Baylor engaged in "flexible, interactive discussions" to remedy the issue. For example, on May 3, when Singhal told Dunn that the alternate entrance was malfunctioning, Dunn contacted facilities immediately, who called a contractor the same day to repair the door. Dunn wrote back to Singhal saying: "Please contact me if you have further concerns." (Doc. 28-2 at 169.) Singhal has not produced any evidence that she contacted Dunn

again regarding difficulty she was experiencing with the alternative entrances. Thus, Baylor fulfilled its obligations under the ADA to reasonably accommodate Singhal's request for accessibility to the Cullen building, and the Court grants summary judgment in favor of Baylor on this particular failure-to-accommodate theory.

### iii.  The lab door

In contrast, there is a genuine dispute of material fact regarding whether Baylor reasonably accommodated Singhal's request to automate the lab door. Unlike the Cullen door, no accommodation was provided Singhal. Rather, Baylor argues that the request itself was unreasonable as a matter of law. (Doc. 34 at 8–12.)

On the one hand, Baylor has provided evidence about the cost of automating the door (which Baylor argues must be understood in light of Singhal's allegedly temporary employment), the amount of force needed to open the door, and deposition testimony from Singhal that she did not strictly need the wheelchair to move around (thus making this a "preferred" but not "necessary" accommodation). In Sreekumar's deposition, he states that he observed Singhal enter and leave the lab on a daily basis, either by opening the door herself or allowing a colleague to open it for her. (Sreekumar Dep. at 19–20.) Baylor additionally argues that it accommodated Singhal in other ways by reducing her workload and allowing her flexible work hours. On the other hand, Singhal has produced evidence that she had difficulty navigating through the door, something to which she has not only testified to in her deposition but that Dunn observed and affirmed after meeting with Singhal. Singhal has also produced evidence that from April through November, Dunn believed that the accommodation was a reasonable one that Baylor would be required to implement. While not dispositive on the issue of reasonableness as a matter of law, Dunn's statements, which were based on her personal knowledge, at the very least support the conclusion that Singhal's request

was not unreasonable as a matter of law, which is all Singhal must show to defeat a motion for summary judgment. The Court also cannot find that spending $7,000 plus maintenance costs to automate the door would have been an unreasonable cost to Baylor, as a matter of law (and neither was it definitively reasonable). Finally, Baylor claims it only made the decision not to automate the door in December, after it had decided Singhal would not be reappointed to her position. But this raises an additional fact issue with respect to Baylor's decision, namely, why it took so long to come to such a decision given that Singhal made her initial request in April and renewed that request repeatedly throughout the summer and fall. While Dunn was in touch with Singhal from April through November 2017, Baylor cannot be said to have definitively engaged in the kind of "flexible, interactive discussions" contemplated by the ADA. *AgroDistrib.*, 555 F.3d at 471. For instance, after Dunn met with and observed Singhal struggle with the door in June, she told Singhal twice in July that Baylor was working on a resolution, but then never followed up until September. In fact, even though Dunn and others were supposed to be working on the issue, she expressed surprise to Singhal in September that the door had not yet been automated. There a genuine dispute of fact regarding the source of this confusion and Baylor's decision-making process regarding the lab door. Nor, based on the plausible argument that the door was prohibitively expensive to automate and that Singhal's employment was temporary, can the Court find that Singhal is entitled to summary judgment on this claim. The parties' cross motions for summary judgment on this issue are therefore denied.

### D. Baylor's Affirmative Defenses

In its Amended Answer, Baylor asserted, among other defenses, four that are relevant here: (1) Singhal failed to mitigate her alleged damages, (2) Singhal's requested accommodations posed an 'undue hardship' to Baylor, (3) Singhal's claims are barred by the after-acquired evidence

doctrine, and (4) Singhal's claims are barred by waiver, estoppel, and/or laches. (Doc. 16 at 11–14.) Singhal has moved for summary judgment as to these defenses. Only the first is in dispute, as Baylor has stipulated that it will not pursue the other three. (Doc. 34 at 16.)

Plaintiffs in employment discrimination cases seeking back pay have a "duty to mitigate" damages by searching for "substantially equivalent employment." *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 393 (5th Cir. 2003); *see also Giles v. Gen. Elec. Co.*, 245 F.3d 474, 492 (5th Cir. 2001) (ADA case noting that "[b]ecause it is an equitable remedy, back pay is subject to a duty to mitigate damages"). "Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the Title VII claimant has been discriminatorily terminated." *West*, 330 F.3d at 393. The employer bears the burden of proving both "that substantially equivalent work was available and that the former employee did not exercise reasonable diligence to obtain it." *Id.*

The record raises a genuine material fact as to whether Singhal exhibited reasonable diligence in searching for similar employment. Most saliently, Singhal stated in her deposition that she did not initially apply for any positions at all, let alone similar research positions, because she felt "traumatized" from her time at Baylor and "could not imagine working for a boss." (Singhal Dep. at 325:15–18.) She also told Sandra Dunn on November 26, 2017 that she was "ok" if the non-grant staff position she ultimately obtained was "not a science related position." (Doc. 28-2 at 187.) While Singhal ultimately obtained employment at MD Anderson Cancer Center as a Scientific Research Project Manager, she began that job nearly two years after she left Baylor; the record is ambiguous at best as to what employment she sought in the months preceding and following Baylor's non-renewal of her contract. And in light of finding a genuine issue of material

30

fact as to whether Singhal exercised reasonable diligence in searching for similar employment, the Court need not consider whether such employment was readily available. *West*, 330 F.3d at 393 ("[O]nce the employer proves that an employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially equivalent employment." (internal quotations and citation omitted)). Thus, Singhal is not entitled to summary judgment on the issue of whether she fulfilled her duty to mitigate damages.

### E.  Whether Singhal May Pursue Compensatory and Punitive Damages

Singhal's Amended Complaint seeks, among other forms of relief, compensatory and punitive damages. (Doc. 2 ¶ 88(j)–(k).) Baylor argues that both forms of damages are unrecoverable under Section 504 of the Rehab Act by *Cummings v. Premier Rehab Keller, PLLC*, 948 F.3d 673 (5th Cir. 2020). Singhal concedes that punitive damages are unavailable (Doc. 43 at 15 n.7) but pursues her claim for compensatory damages, arguing that the holding in *Cummings* is limited to non-employment contexts.[17] The Court agrees with Baylor's reading of the law.

In *Cummings*, the plaintiff, who is deaf and legally blind, sought physical therapy services from the defendant, a rehabilitation clinic which receives federal funds. Due to her disabilities, she additionally requested that the defendant provide an American Sign Language interpreter. The

---

[17] Singhal also notes that the circuits are split on this issue, *see Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173 (11th Cir. 2007), and that a petition for a writ of certiorari has been filed in *Cummings*. 948 F.3d 673, *petition for cert. filed*, 2020 WL 5040489 (U.S. Aug. 21, 2020) (No. 20-219). As a result, Singhal requests that this Court either (1) decline to follow *Cummings* or (2) wait for the Supreme Court to decide this issue. (Doc. 59.) But the existence of conflicting out-of-circuit authority does not allow this Court to disregard *Cummings*, which is binding. And as to Singhal's alternative request, this Court declines to wait for the Supreme Court to possibly grant certiorari and decide the issue, which may not occur for a year or longer. *Cf. United States v. Davila-Medina*, 744 F. App'x 868, 869 n.1 (5th Cir. 2018) ("Even where the Supreme Court has granted certiorari, this court is bound by its own precedent, unless and until that precedent is altered by a decision of the Supreme Court."). Of course, a party is always free to move this Court to reconsider, if the relevant law changes while this Court retains jurisdiction over the case.

plaintiff sued for compensatory damages resulting from her emotional distress. *Cummings v. Premier Rehab, PLLC*, No. 18-CV-649-A, 2019 WL 227411, at *4 (N.D. Tex. Jan. 16, 2019). In deciding whether emotional distress damages are available under the Rehab Act, the Fifth Circuit identified the "fundamental question in evaluating damages in the context of Spending Clause legislation [as] whether 'the funding recipient is *on notice* that, by accepting federal funding, it exposes itself to liability of that nature.'" *Cummings*, 948 F.3d at 678 (quoting *Barnes v. Gorman*, 536 U.S. 181, 187 (2002)) (emphasis in original); *see id.* at 676 (noting that Section 504 of the Rehab Act is Spending Clause legislation).[18] The Fifth Circuit concluded that as a general matter, recipients of federal funds are not on notice of potential liability stemming from emotional distress, and such damages are therefore unavailable under the Rehab Act. *Id.* at 678.

Singhal attempts to distinguish *Cummings* on the basis that employers, in contrast to the rehabilitation clinic in *Cummings*, are "on notice" and thus liable for emotional distress damages due to the closeness of the employee-employer relationship, and the availability of such damages in intentional discrimination cases brought under the Civil Rights Act. 42 U.S.C. § 1981a. However, as Baylor argues, that statute applies only to claims brought under Section 501 of the Rehab Act, which regulates federal government employment. More to the point, *Cummings* does not direct district courts to perform a case-by-case analysis of whether a covered entity is on notice of its exposure to liability for emotional distress damages but rather states a more general rule. And at least one other district court has similarly found that *Cummings* bars emotional distress damages under the Rehab Act as applied to employers (although nominal damages for injuries stemming from intentional discrimination are permitted). *See Lockwood v. Our Lady of the Lake Hosp., Inc.*, 467 F. Supp. 3d 435, 438 (M.D. La. June 15, 2020).

---

[18] Section 504 of the Rehab Act is Spending Clause legislation. *Cummings*, 948 F.3d at 676.

Thus, the Court concludes that both punitive and compensatory damages are unavailable for Singhal under her Rehab Act claim.

## IV.    EVIDENTIARY DISPUTES

Evidence presented at the summary judgment stage must be admissible at trial. *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285 (5th Cir. 2004). Each party has filed several objections to evidence that the other has provided in support of their respective motions, responses, and replies.

### A.  Singhal's Objections and Motion to Strike

Singhal objects to certain pieces of evidence that Baylor has filed in both its response to Singhal's MPSJ and to its own MSJ. (Docs. 38, 39, 45.) First, Singhal argues that the transcripts of her audio recordings are inadmissible because they lack foundation, Fed. R. Evid. 901,[19] and violate the best evidence rule, Fed. R. Evid. 1002. First, the transcripts meet the low bar for authentication, as each was certified by a court reporter. Moreover, Singhal does not question that authenticity of the recordings themselves, as she provides her own transcripts of the same recordings. As to Singhal's Rule 1002 objection, the Court finds that the transcripts are admissible as a "duplicate" under Rule 1003, as the authenticity of the underlying recording is not in question. *See, e.g.*, *Wajvoda v. Menard, Inc.*, No. 2:11-cv-393, 2015 WL 5773648, at *3 (N.D. Ind. Sept. 30, 2015). This objection is denied.

Second, Singhal objects to two paragraphs of Morille's Declaration as contradictory of his deposition testimony. The Court finds that there is a genuine issue of material fact as to the reasonableness of Baylor's decision not to automate the lab door, whether or not these statements are taken into account, and the objection is therefore moot.

---

[19] Singhal also argues that because the transcripts lack authenticity, they are inadmissible hearsay, but she does not sufficiently explain this argument for the Court to fairly consider it.

Third, Singhal objects to portions of Sreekumar's Declaration. Four of these objections are to statements by Sreekumar to others in the lab, of the form "I instructed. . . ." These statements are not offered for the proof of the matter asserted, but rather to indicate that Sreekumar made the statements. They are thus not hearsay. Singhal also objects to a paragraph in which Sreekumar attests to attending the December 4, 2017 meeting with Baylor administrators, and to certain statements made therein. Similarly to Singhal's objections to the Morille, Declaration, the Court finds that there is a genuine issue of material fact as to the reasonableness of Baylor's decision not to automate the lab door, whether or not these statements are taken into account, and the objection is therefore moot.

Finally, Singhal objects to the inclusion of a one-page budget detail manifest on the basis that it was untimely produced in violation of the discovery deadline. This piece of evidence is not dispositive on any of the issues before the Court, and this objection is denied as moot.

## B. Baylor's Objections and Motion to Strike

Baylor moves to strike portions of Singhal's Second Declaration (Doc. 53.) First, Baylor argues that alleged comments from coworkers constitute inadmissible hearsay. However, these statements are admissible as statements made by the opposing party's employees within the scope of that relationship, Fed. R. Evid. 801(d)(2)(D), and the objection is therefore denied.

Second, Baylor moves to strike as misleading or contradictory of other evidence paragraph 9 of Singhal's declaration, in which she states that Sreekumar did not accommodate her request to work less than 6 hours per day in response to receiving the May 23 doctor's note. Baylor argues that this testimony is contradicted by Singhal's admission that Sreekumar did allow her flexibility in her working hours (Singhal Dep. at 242:12-14) as well as the contents of the recording itself. However, having to work a certain number of hours in general is not necessarily inconsistent with

34

being allowed to keep a flexible work schedule. For example, one may be able to begin their workday late and end it late, or begin early and end early, while still being required to perform a specific number of hours of work. In any event, the Court finds that Sreekumar reasonably accommodated Singhal with respect to her work in the lab, even taking these statements into account. This objection is therefore denied as moot.

Third, Baylor moves to strike as misleading or contradictory of other evidence paragraphs 7–10 and 16, in which Singhal characterized statements made during recorded conversations with other Baylor employees. Baylor argues that these characterizations are misleading and contradict the recordings themselves, audio of which and transcripts of which have been offered as evidence by Baylor. To the extent the statements directly contradicted the recordings (or transcripts thereof) themselves, the Court relied solely on the latter in reaching its conclusions.

## V.    CONCLUSION

For the foregoing reasons, the Court:

- grants summary judgment in favor of Baylor on Singhal's discrimination claim, retaliation claim, and failure-to-accommodate claim with respect to decisions within Sreekumar's lab and with respect to the Cullen door;

- denies summary judgment for either party on Singhal's failure-to-accommodate claim with respect to the lab door;

- grants summary judgment in favor of Singhal on Baylor's undue hardship, after-acquired evidence, and waiver/estoppel/laches defenses;

- denies summary judgment on Baylor's failure-to-mitigate affirmative defense; and

- grants summary judgment in favor of Baylor on the issue of punitive and compensatory damages.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on March 31, 2021.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE